William **BJORNSON**, Plaintiff,

v.

**DAIDO METAL U.S.A., INC.,** Defendant.

No. 97 C 5976.

United States District Court,
N.D. Illinois,
Eastern Division.

July 28, 1998.

Order Supplementing Opinion
July 31, 1998.

Sandra G. Quello, Ernest T. Rossiello & Associates, P.C., Chicago, IL, for Plaintiff.

Nancy E. Sasamoto, Mitchell S. Chaban, Masuda, Funai, Eifert & Mitchell, Ltd., Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

William Bjornson ("Bjornson") has filed suit against Daido Metal U.S.A., Inc. ("Daido") under the Fair Labor Standards Act ("Act"), 29 U.S.C. §§ 201–219,[1] and the Illinois Minimum Wage Law ("Illinois Act"), 820 ILCS 105/1 to 105/13, seeking damages for Daido's failure to pay him for hours of overtime labor that he assertedly performed for it.[2] Bjornson also requests preliminary and permanent injunctive relief under Act §§ 215(a)(3) and 216(b) to restrain Daido from retaliating against him for bringing this action.

Daido now moves for summary judgment under Fed.R.Civ.P. ("Rule") 56. Both sides have complied with this District Court's General Rule ("GR") 12(M) and 12(N),[3] which has been adopted to highlight the existence

---

1. All citations to the Act will take the form "Act § —," using the title 29 numbering rather than the Act's internal numbering.

2. Originally Bjornson also charged Daido with violating the Illinois Wage Payment and Collection Act ("Collection Act"), 820 ILCS 115/1 to 115/16, but Bjornson has presented no evidence or argument in support of that potential claim in opposition to Daido's Rule 56 motion. Because Bjornson bears the burden of proof on that claim, his failure to argue it is fatal, for "[i]f the non-moving party bears the burden of proof on an issue, ... that party may not rest on the pleadings and must instead show that there is a

genuine issue of material fact" (*Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 (7th Cir. 1998), quoting *Sample v. Aldi, Inc.*, 61 F.3d 544, 547 (7th Cir.1995)). Bjornson's effectively abandoned Collection Act claim is therefore dismissed with prejudice, and the rest of this opinion deals only with the argued claims.

3. This opinion refers to Daido's GR 12(M) statements as "D. 12(M) ¶ —." All of the cited statements have either been explicitly or implicitly admitted in the corresponding response. That same "D." abbreviation is used for Daido's Exhibits.

or nonexistence of any material fact disputes, and Daido's motion is fully briefed and ready for decision. For the reasons set out in this memorandum opinion and order, Daido's motion is granted in its entirety.

### Summary Judgment Standards

Familiar Rule 56 principles impose on Daido the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.,* 116 F.3d 262, 265 n. 2 (7th Cir.1997)).

### Facts

Bjornson began work for Daido on May 1, 1995 after a chance encounter led Daido's President Masanori Furuya ("Furuya") to offer him a job (D.12(M) ¶¶ 2–3). Daido assembles and sells bearings for shock absorbers and struts (*id.* ¶ 1). Bjornson was assigned to Daido's Morton Grove, Illinois office as a "liaison," with his primary duties involving the maintenance of Daido's files and the transfer of information between Daido and its primary client, Caterpillar (*id.* ¶ 5).

Bjornson was one of seven office employees at Daido's Morton Grove plant (*id.* ¶ 1). His supervisor was Daido's general manager Satoshi Yasuda ("Yasuda") until Yasuda left Daido in December 1996 (*id.* ¶ 13).

Bjornson's "Notice of Employment" laid out the terms of his employment and his standard work schedule. Bjornson's regularly scheduled workweek was Monday through Friday, with his workday beginning at 8:30 a.m. and running until 5:30 p.m. (*id.* ¶ 3). Daido paid Bjornson for a one-hour lunch but required that he stay in the office to work if needed during that time. Bjornson received one hour of overtime pay for his work from 4:30 p.m. to 5:30 p.m. every day (*id.*).

4. In June 1996 Daido installed a time clock and required its employees to punch time cards at the start and end of each workday, but employees

When Bjornson began working at Daido he was responsible for keeping track of his regular and overtime hours in a payroll book (*id.* ¶ 6).[4] Bjornson submitted his hours to Furuya for review at the end of each pay period (*id.*). Furuya checked Bjornson's entries, corrected any errors (including instances where Bjornson underestimated the money due him) and calculated Bjornson's accrued wages (*id.*). Furuya then returned the book to Bjornson, who confirmed his acceptance of Furuya's calculations by stamping his *Hanko,* or mark, in the book (*id.*).

Bjornson recorded one overtime hour in his payroll book virtually every workday, and he also claimed additional hours from time to time. From May 1995 through April 1996 Bjornson requested 8–1/2 hours of overtime in addition to the one hour per day that he took as a matter of course (D.Ex. 3). Similarly, from September 1996 to August 1997 Bjornson asked for 8 hours of overtime above and beyond his daily allotment (*id.*). During those periods Bjornson generally asked for only one extra hour at a time, and there were only three occasions when he asked to be paid for work after 7:30 p.m. (*id.*).

During the summer months of 1996, however, Bjornson was assigned the task of installing a new computer invoice system at Daido (D.12(M) ¶ 15). During the course of that project Bjornson requested between one to four hours of additional overtime (calculated in 15–minute increments) for virtually every day from May until mid-August (D.Ex. 3). For those four months Bjornson successively recorded 34.5, 40.5, 46 and 18.5 hours of additional overtime (*id.*).

Bjornson was compensated for every hour that he recorded in his payroll book between May 1995 and August 1997, a total of 694 hours of overtime (D.12(M) ¶ 10). Nonetheless, on August 22, 1997 Bjornson filed this suit against Daido alleging that he had not been paid for all of the overtime hours that he had worked for Daido.

were still expected to record their working hours in their payroll books (D.12(M) ¶ 7).

### Bjornson's Overtime Claim

■ Act § 207(a)(1) requires Daido to pay its employees overtime compensation of 1–1/2 times their normal wages for hours worked in excess of 40 hours per week. Bjornson does not dispute that Daido paid him at the correct rate for the overtime hours that he recorded in his payroll book and submitted to Furuya. Instead Bjornson asserts that Daido failed to pay him for additional overtime hours that he worked but never recorded in his payroll book or submitted to Daido's management.[5]

Bjornson points to *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946) for the analytical framework that should govern his claim. *Mt. Clemens, id.* at 687–88, 66 S.Ct. 1187 held that when an employer's compensation records are inaccurate or inadequate:

> [W]e hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

But Bjornson's problem is that before the *Mt. Clemens* burden-shifting framework can come into play, he must first show that Daido's time records are either "inaccurate or inadequate" (*id.* at 687, 66 S.Ct. 1187).[6] Bjornson does not argue that Daido's system of recordkeeping was inadequate in any way, and his contention that Daido's records are inaccurate is wholly dependent on his own

deposition testimony. Bjornson estimated that for his first year at Daido (from May 1995 to April 1996) he usually stayed until 8:30 p.m. (Bjornson Dep. 108–09). Bjornson's hours then increased during the summer of 1996 because he had to install Daido's new computer invoicing system—and he testified that during the May–June time period he worked until 10 or 11 p.m. daily (*id.* at 90). Bjornson acknowledged that he worked fewer hours after that peak period, but he still estimated that after August 1996 he worked until 7:30 p.m. on average (*id.* at 109–10).

But Bjornson's payroll book, all the entries in which he himself made contemporaneously with his work performance each day, is totally at odds with his current claims. As already noted, Bjornson rarely claimed any time after 5:30 p.m. during most of his tenure at Daido. And even in the summer of 1996, when Bjornson did record longer hours because of a special project, he never claimed that he worked past 9:15 p.m. (D.Ex. 3).

Obviously aware of that contradiction, Bjornson seeks to attribute his failure to submit all of his overtime work to what he labels as Daido's corporate culture. According to Bjornson, Daido expected its employees to work as long as necessary to complete their assignments without asking questions or requesting more money (Bjornson Dep. 95). Bjornson said that he was reluctant to put in for more overtime than he did because he feared a "big hassle" if he did so (*id.* at 94). That story, unsupported even inferentially by anything in the record, was effectively acknowledged by Bjornson himself to be no more than subjective speculation (*id.* at 98–99).

But even more importantly, Bjornson's alleged reluctance to submit overtime claims is flatly belied by his own demonstrated willingness and ability to do exactly that. Bjornson submitted detailed and extensive requests for

---

5. There is no question that Bjornson worked at least 45 hours each week, so that any compensable additional hours would have constituted overtime.

6. Of course Bjornson does not literally have to "show" or "prove" anything, for Rule 56 requires only that he demonstrate the existence of a genuine issue of material fact to defeat Daido's summary judgment motion. Hence although this opinion sometimes uses the quoted terms as shorthand, both to avoid cumbersome repetition of the summary judgment standard and to echo the language of controlling caselaw, this Court has analyzed the issues in terms of the lesser burden that Rule 56 places on Bjornson.

overtime (over and above the one hour that he claimed virtually every workday) throughout his entire tenure at Daido. Those consistently-presented and always-honored claims, which aggregated more than 34 hours of overtime pay (over and above the one-hour daily allotment) in each of the months from May to July 1996, and which totaled 694 hours of overtime from May 1995 to August 1997, directly negate Bjornson's newly-claimed diffidence.

As for the notion of some presumably hostile "corporate culture," Bjornson suffered no adverse job consequences as a result of his requests for overtime. Quite the reverse is true: Not only was he always paid for the time that he requested, but Furuya actually corrected Bjornson when he had mistakenly undercalculated the hours recorded in his book. Nor has Bjornson supplied any evidence of how or when Daido discouraged him (or anyone else) from asking for overtime. On the contrary, he admitted that he was never told that he had to perform uncompensated overtime at Daido (Bjornson Dep. 95).

Bjornson's attempted explanation that even though he put in daily requests he made them out for only a portion of his overtime is further contradicted by his actual pattern of overtime submissions. In those requests Bjornson recorded his time in 15-minute increments, yet he proffers no explanation at all as to why he took such careful track of his overtime minutes if he did not record all of his time.

Even beyond those systemic gaps and contradictions, Bjornson's current story also fails to explain why he arbitrarily chose to record the amounts of overtime for which he did request payment. For example, while Bjornson now claims to have worked until 10 or 11 p.m. every night during May–June of 1996, his payroll book shows him leaving Daido during that period over a wide range of quitting times from 5:30 p.m. to 9:15 p.m. (D.Ex. 3). Bjornson offers no rationale for that daily variation, even though he allegedly worked until the same (and much later) times every night. Similarly, Bjornson provides no cover story for why he only sporadically entered extra overtime hours as a general matter (excluding the summer of 1996), when he now claims to have worked late virtually every day.

It is a gross understatement to label the facts that have been described here as demonstrating numerous and glaring inconsistencies between Bjornson's uniform pre-lawsuit conduct and his current deposition statement—made in preparation for trial—that he did not record most of his overtime because he feared a "big hassle" if he did so. In principle the situation here is no different from that of a litigant who, in an effort to defeat summary judgment by creating an issue of material fact, submits an affidavit (prepared with the "assistance" of counsel) that tries to cover or to retract the litigant's earlier sworn deposition testimony that had contained an unfavorable statement or omission. Such attempts to create "sham" issues of fact do not suffice to thwart Rule 56 motions (among the many decisions of our Court of Appeals that announce and apply that principle, see *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168–69 (7th Cir.1996) and the numerous cases cited there). Bjornson's present self-contradictory testimony—now that he has brought suit—that he worked more hours than he recorded contemporaneously with his actual day-to-day work deserves no more respect.

■ This Court recalls no instance in which our Court of Appeals has particularized in analytical terms the basis on which such affidavits are discredited (other than simply to announce why they are unreliable). After all, those discredited affidavit statements *are* sworn to, and the rules announced in the seminal *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) decision is that credibility determinations and inference-drawing are not the business of a court that addresses a Rule 56 motion (*id.* at 255, 106 S.Ct. 2505). But this Court's view has always been that such rulings reflect another equally definitive aspect of *Anderson, id.* at 250–52, 106 S.Ct. 2505, which teaches that the Rule 56 standard coincides with the standard for judgments as a matter of law under Rule 50(a). That latter Rule looks at whether any rational factfinder could decide the case in favor of

the target of the motion brought under Rule 50(a)(or by parity, under Rule 56)—"whether it [the evidence] is so one-sided that one party must prevail as a matter of law" (*Anderson*, 477 U.S. at 252, 106 S.Ct. 2505). To that limited extent, then, the weighing of evidence is permissible.

Just so here. Bjornson's post hoc deposition testimony, which is directly at war with his own actual conduct and recordkeeping, has not—even with the benefit of reasonable inferences—created a genuine factual issue that would enable a reasonable factfinder to find that Daido's time records (prepared by Bjornson himself) are inaccurate or that Bjornson actually worked more hours than he recorded in his payroll book. Bjornson's failure to overcome even that minimal hurdle provides ample grounds to grant Daido's motion for summary judgment.

█ Suppose however that this Court were to ignore that principle and were to credit Bjornson's assertions that he worked extra uncompensated hours. Even so, Daido would still be entitled to summary judgment on Bjornson's claim for damages, because Bjornson has failed to establish that Daido knew that he had performed uncompensated overtime.

That knowledge requirement derives from the language of Act § 207(a)(1) that provides that an employee must be "employed" before a claim may be brought. In turn Act § 203(g) defines "employ" as "to suffer or permit to work," and "suffer" and "permit" have consistently been interpreted as requiring the knowledge of the employer (*Davis v. Food Lion*, 792 F.2d 1274, 1276–77 (4th Cir. 1986); see 29 C.F.R. § 785.11). Thus Daido could be liable under Act § 207(a)(1) only if it had actual or constructive knowledge that Bjornson had performed unpaid overtime work for Daido (*Bailey v. County of George-*town, 94 F.3d 152, 156 (4th Cir.1996); cf. *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 523 (2d Cir.1998)).

In that respect, Bjornson admits not only that he failed to record or submit his hours, but also that he never otherwise informed Daido's management directly of his asserted extra work (D.12(M) ¶ 11). Bjornson nonetheless urges that Daido knew about his uncompensated labor because Yasuda was generally at the office most of the times that Bjornson was there after 5:30 p.m. (Bjornson Dep. 94). Because Yasuda regularly reviewed Bjornson's time sheets (Yasuda Aff. ¶ 4), Bjornson concludes that Yasuda (and by extension Daido) knew that he worked longer hours than he claimed in his payroll book.[7]

Yasuda acknowledged that he saw Bjornson stay in the office beyond 5:30 p.m and that he himself sometimes left the office before Bjornson (Yasuda Aff. ¶ 7).[8] But Yasuda did *not* confirm that he ever saw (or that he otherwise knew) that Bjornson was working for Daido when Bjornson stayed late. On the contrary, Yasuda observed Bjornson playing computer games and doing personal work on his computer after hours (Yasuda Aff. ¶ 9). Yasuda denied any other knowledge about what else Bjornson did when he remained at Daido after the end of the normal workday (*id.*).

Bjornson insists that he stayed late at Daido only in order to perform work-related tasks (Bjornson Dep. 96), but that statement does not reasonably create the inference that Yasuda knew what Bjornson was doing. It will again be recalled that throughout his tenure at Daido Bjornson was regularly turning in, and was then reconfirming the validity of, time records reflecting that his workday ended earlier—hours earlier—than he now claims. And Bjornson does not say that he and Yasuda worked on any project together

---

7. Of course Yasuda could have witnessed Bjornson working extra overtime only before December 1996, when Yasuda left Daido. Bjornson offers no explanation that might cover the period from December 1996 to August 1997, so there is no question that Daido was unaware of any unrecorded overtime in that span.

8. Bjornson claims that Yasuda usually worked at Daido until 9:30 or 10 p.m. (Bjornson Dep. 95), while Yasuda claims that he typically stayed until 7 or 8 p.m. (Yasuda Aff. ¶ 7). Because *this* facet of Bjornson's testimony is not flatly contradicted by his own conduct when the events were taking place, the normal Rule 56 rule applies: Bjornson's version of the facts must be credited. Hence this opinion assumes that Yasuda's typical workday lasted until 9:30 or 10 p.m.

or that Yasuda directly supervised his work after-hours. Similarly, Bjornson does not suggest that he accomplished so much work that Daido's management must have known that he was working more overtime than he requested.

In sum, Bjornson has not submitted evidence that would reasonably lead to the conclusion that Yasuda or anyone else at Daido knew that he was working overtime hours that he was not recording in his payroll book. Accordingly, even if Bjornson had performed such uncompensated labor (a hurdle at which he has already fallen), the record calls for a conclusion as a matter of law that Daido did not violate Act § 207(a)(1), and Daido's Rule 56 motion must be granted as to Bjornson's claim for back wages and damages under the Act.

### Illinois Act Claim

Bjornson does not deny that the success of his state law claim under the Illinois Act is intertwined with the success of his federal claim under the Act. Illinois Act § 105/4a(1) parallels the language of Act § 207(a)(1), and Illinois courts subject the state statute to the same interpretation and application as its federal counterpart (*Haynes v. Tru–Green Corp.*, 154 Ill.App.3d 967, 977, 107 Ill.Dec. 792, 507 N.E.2d 945, 951 (4th Dist.1987)).

This Court will perforce treat the two statutes as co-extensive (see *Condo v. Sysco Corp.*, 1 F.3d 599, 601 n. 3 (7th Cir.1993)). Accordingly Daido's Rule 56 motion as to Bjornson's claim under the Illinois Act is granted for the same reasons already stated as to Bjornson's federal claim.

### Injunctive Relief

■ Bjornson's Complaint also asked for a preliminary and permanent injunction under Act §§ 215(a)(3) and 216(b) to prevent Daido from retaliating against him for filing this lawsuit. Daido now moves for summary judgment on that prayer for relief on the ground that as a matter of law private parties have no power to request injunctive relief under the Act.

Our Court of Appeals has not squarely faced that question. Bjornson points out that *Avitia v. Metropolitan Club of Chicago, Inc.*, 924 F.2d 689 (7th Cir.1991) suggests that the issue is open here. *Avitia, id.* at 691 held that issue preclusion barred the employees in that case from challenging a district court ruling that private parties could not seek a preliminary injunction under the Act, but observed in a footnote "[t]hat this result must obtain is somewhat regrettable, for the statutory question at issue is a significant one, and not without sensible arguments on both sides" (*id.* at 691 n. 1).

Despite that aside (one step below dictum) in *Avitia*, every Circuit that has addressed the issue over a period spanning more than a half century has agreed that the plain language of Act §§ 211(a) and 217 allows only the Secretary of Labor to bring an action for injunctive relief under the Act (see *Powell v. State of Florida*, 132 F.3d 677, 678–79 (11th Cir.1998)(per curiam); *Barrentine v. Arkansas–Best Freight Sys., Inc.*, 750 F.2d 47, 51 (8th Cir.1984); *EEOC v. Gilbarco, Inc.*, 615 F.2d 985, 995 (4th Cir.1980); *Morelock v. NCR Corp.*, 546 F.2d 682, 688 (6th Cir.1976), *rev'd on other grounds,* 435 U.S. 911, 98 S.Ct. 1463, 55 L.Ed.2d 503 (1978); *Powell v. Washington Post Co.*, 267 F.2d 651, 652 (D.C.Cir. 1959)(per curiam); *Roberg v. Henry Phipps Estate*, 156 F.2d 958, 963 (2d Cir.1946); *Bowe v. Judson C. Burns, Inc.*, 137 F.2d 37, 39 (3d Cir.1943)). This Court is not about to flout that overwhelming line of authority holding that private parties suing under Act § 216(b) are restricted to recovering back wages and liquidated damages.

Moreover, it does not conform to the established principles of equity—and an injunction is of course the quintessential form of equitable relief—to consider enjoining a party that has been found innocent of past wrongdoing, and that has given no indication of any future wrongdoing, against the purely speculative commission of future misdeeds. For more than one reason, then, Bjornson is barred as a matter of law from obtaining either a preliminary or permanent injunction under the Act, and Daido's Rule 56 motion is granted in that respect as well.

### Conclusion

Daido has met its burden of establishing the lack of a genuine issue of material fact as

to Bjornson's claims for damages under both the Act and the Illinois Act (as well as under Bjornson's unargued state law claim discussed in n. 2). Daido has likewise met its burden as to Bjornson's request for injunctive relief. Accordingly Daido is entitled to a judgment as a matter of law on all of Bjornson's claims. This action is dismissed with prejudice.

## SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

This Court's July 28, 1998 memorandum opinion and order ("Opinion") based its grant of summary judgment in favor of Daido Metal U.S.A., Inc. and against William Bjornson ("Bjornson") in part on the rejection of substantial aspects of Bjornson's testimony. As the Opinion explained, for that purpose this Court followed and applied the Supreme Court's teaching as to the identity of the standards for summary judgment under Fed. R.Civ.P. ("Rule") 56 and for judgment as a matter of law under Rule 50(a).

In one of the instances of serendipity that are encountered with surprising frequency in the occupation of judging, this Court has since received and reviewed an opinion from our Court of Appeals issued on July 22 (*In re Chavin*, 150 F.3d 726 (7th Cir.1998)) that bears directly on the same subject. This supplement to the Opinion is therefore issued simply to call attention to the discussion in *Chavin*, at 7284 that in this Court's view strongly supports both the analysis and the result reached in the Opinion. That discussion confirms that witnesses' testimony as well as inferences may be rejected on grounds of implausibility, though such rejection is to be reserved for "extreme cases," and that (*id.* at 729):

> For the case to be classified as extreme, the testimony sought to be withheld from the trier of fact must be not just implausible, but utterly implausible in light of all the relevant circumstances.

Like *Chavin*, this case fits that description (as explained at some length in the Opinion). This Court therefore reconfirms both the analysis and the result reached in the Opinion.