**Brian CUNNINGHAM, Plaintiff,**

v.

**GIBSON ELECTRIC CO., INC., Defendant.**

**No. 97 C 7170.**

United States District Court,
N.D. Illinois,
Eastern Division.

April 23, 1999.

Sherrie E. Voyles of Jacobs, Burns, Sugarman, Orlove & Stanton, Chicago, IL, for plaintiff.

Edward W. Bergmann and Noah A. Finkel of Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, Senior District Judge.

This Court's conduct of a February 1999 bench trial in this action has been followed by the submission of proposed findings of fact and conclusions of law by counsel for plaintiff Brian Cunningham ("Cunningham") and counsel for defendant Gibson Electric Co., Inc. ("Gibson"). This Court has given full consideration to each party's submission and to its detailed trial notes (in aid of its own independent recollection), and what follows are this Court's findings of fact ("Findings") and conclusions of law ("Conclusions"). To the extent (if any) that the Findings as stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings. In both those respects, see *Miller v. Fenton*, 474 U.S. 104, 113–14, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

### Findings of Fact

1. Cunningham is a 20–year journeyman electrician in the construction industry. Gibson is an electrical construction company with its principal office location in Oak Brook, Illinois (Stip.¶ 2).[1] From approximately January 1990 through October 1997 Gibson employed Cunningham in various capacities, including journeyman, foreman, general foreman, job superintendent, assistant project manager and field superintendent (Stip.¶ 4).

2. Gibson's operations have been and are covered by the minimum wage and overtime provisions of the Fair Labor Standards Act as amended, 29 U.S.C. §§ 201–219 ("FLSA") (Stip.¶ 3). At all times during Cunningham's employment by Gibson he was covered by and entitled to FLSA rights, protections and benefits (Stip.¶ 6).

3. Throughout Cunningham's employment by Gibson he was a member of a bargaining unit covered by a collective

---

1. "Stip. ¶ __" refers to the parties' joint statement of uncontested facts in the Final Pretrial Order ("FPTO"). Because these Findings will not cite to the witnesses' testimony that supports them, frequently a parenthetical citation to a "Stip. ¶" or to an exhibit will not cover everything contained in the sentence to which the parenthetical citation is annexed. In every such instance the sentence in the Finding itself accurately portrays testimony credited by this Court.

bargaining agreement ("CBA") between Gibson and Local 134, International Brotherhood of Electrical Workers Union, AFL—CIO ("Local 134") (Stip.¶ 7). Under the CBA Gibson must pay an hourly wage rate to bargaining unit employees (Stip.¶ 8) and must also make contributions on a per hour basis to a health and welfare fund and a pension fund (collectively "Local 134 Funds") on behalf of such employees (Stip.¶ 10). During the time frame covered by this action Gibson also made contributions to the Local 134 Funds on behalf of some of its project managers, while at the same time insisting that not all of the CBA provisions, particularly its overtime provisions, were applicable to such project managers.

4. Gibson paid Cunningham from September 18 to December 31, 1994 at the rate of $27.65 per hour, from January 2 to June 4, 1995 at the rate of $29.15 per hour, from June 4, 1995 to June 3, 1996 at the rate of $30.15 per hour and from June 3 to November 11, 1996 at the rate of $31.15 per hour (Stip.¶ 9).

5. At all times relevant to this action:

(a) Michael McInerney ("McInerney") has been and is Gibson's President (Stip.¶ 11).

(b) Kevin Kearney ("Kearney") was and is a project manager and supervisor for Gibson.

(c) David Gelinas ("Gelinas") was and is another project manager and supervisor for Gibson.

Glen Zemla ("Zemla") was Gibson's superintendent for Cook County from approximately 1990 to 1993. At least since 1992, when McInerney became Gibson's president, Zemla reported to McInerney. Next James Kratochvil ("Kratochvil") replaced Zemla as superintendent from approximately December 1993 to September 1994, also reporting to McInerney. Then in September 1994 McInerney offered Cunningham the position of superintendent for Cook County (Stip.¶ 12), and Cunningham assumed those duties beginning September 18, 1994 (Stip.¶ 13).

6. As an electrical contractor Gibson had basically two types of contracts with its customers: contract jobs and time-and-materials ("T & M") jobs. Contract jobs are negotiated between a company such as Gibson and its customers, with Gibson agreeing to perform any such job for a specified price. On a T & M job Gibson is reimbursed for every hour that its field employees work based on a negotiated hourly rate, which includes a markup or profit margin of 15% (of which 4% is profit and 11% is overhead). Expenses incurred by Gibson for project management and superintendence are included in the overhead amount. In some circumstances Gibson specifically negotiates in the T & M contracts to be reimbursed for time spent by project management and superintendence as well (see P.Ex. 38). Examples of Gibson contract jobs were its CTA Green Line ("Green Line") job and Northwestern Hospital Temporary Power ("Northwestern Temporary") job. Examples of its T & M projects were CTA's Cubic Fare ("Cubic Fare") project and the Museum of Contemporary Act ("MCA") job.

7. Before Kratochvil left Gibson he showed Cunningham how to report his time as a superintendent. Kratochvil instructed Cunningham that for every day that he would be getting paid, he should report a full 8 hours as assigned to one job listed on the commercial job list and selected by him at random, so that each week Cunningham would charge 8 hours to each of five jobs, regardless of whether he had worked on the particular jobs or not. Kratochvil did not address how or where Cunningham should report any overtime hours. Before Cunningham became superintendent, former superintendent Zemla had told Cunningham that he himself did not receive overtime compensation as a superintendent.

8. All former Gibson superintendents and its current superintendent provided essentially consistent testimony that as a general rule they did not report overtime

hours worked as a superintendent. Zemla, Kratochvil[2] and Cunningham all so testified. Tom Brummel ("Brummel"), who before November 1997 had been Gibson's superintendent for DuPage County and the collar counties, at that time (upon Cunningham's demotion) became superintendent for the entire company's operations in Cook County as well as DuPage and the collar counties. Although Brummel had spent most if not all of his 40 hours a week working as superintendent for DuPage and the collar counties before he also assumed the superintendent's duties for Cook County, he testified that he did not "need" to work overtime as a superintendent after he was assigned the additional superintendent's duties for Cook County, so that his only reported overtime was when he was working with the tools like any tradesman.

9. Gibson, through its President McInerney, treated the position of superintendent as though it were a salaried office position exempt from FLSA's overtime provisions. By definition any reported overtime hours of superintendents (except on T & M jobs that obligated the customer to pay for superintendence), if paid for under FLSA's provisions, would have directly reduced Gibson's profits.

10. Before he became superintendent in September 1994, Cunningham was an assistant project manager on the Sears Tower Project, reporting directly to Kearney (Stip.¶ 14). As such Cunningham was in charge of the construction crew as well as the maintenance crew under contract with John Buck Company, the Sears Tower property manager. Kearney instructed Cunningham that he could not report his overtime hours because Gibson could not bill the customer for such hours and because assistant project managers did not receive overtime. Kearney confirmed the fact that Gibson was not being reimbursed for Cunningham's time in a letter to John Buck Company (P.Ex. 6). Hence during his tenure as assistant project manager Cunningham reported overtime hours only when instructed to do so by Kearney, who also told Cunningham how many hours to report and to which job number the time should be charged. Those entries did not necessarily reflect the actual hours spent or projects on which Cunningham actually worked.

11. Gibson employees from journeymen to project managers are supposed to charge their time to specific job numbers. But it is clear from the evidence that at least in the case of superintendents and project managers their time is not necessarily charged to the projects where they actually spend their time. Thus Brummel (when full time superintendent for DuPage County) had charged a large portion of his time to a residential job number that had nothing to do with his superintendent duties. Similarly, Kratochvil charged a large portion of his time actually spent as superintendent to the project number assigned to the T–5 project at O'Hare Airport. As for Cunningham himself, for a period of 10 weeks beginning in January 1996 McInerney instructed Cunningham to charge all of his time working at the CTA Green Line project (a contract job, it will be recalled) to the MCA project, a T & M project where Gibson was reimbursed by the customer for all of Cunningham's time (P.Exs. 16, 17, 21, 41 and 42). Cunningham did charge his time as so instructed until Kearney told him that it was no longer possible to bury Cunningham's time at MCA because it was winding down. Thereafter Cunningham resumed billing his time to the CTA Green Line project, where he had actually been working all the time (P.Exs. 16, 17, 21, 41 and 42).

12. When McInerney offered Cunningham the superintendent's job, McInerney told Cunningham that his pay would be based on a general foreman's hourly wage

---

**2.** Although Kratochvil testified at the trial that he voluntarily "comped" himself for overtime rather than reporting it, that was at odds with his affidavit (signed and notarized before Kratochvil returned to work for Gibson) in which he stated that he had an "agreement with Michael McInerney, the president of Gibson, that I would receive a salary based on 40 hours per week at general foreman's rate."

rate multiplied by 40 hours, that Cunningham would be provided with a company vehicle and that his expenses would be paid. During that conversation McInerney did not instruct Cunningham on how to report his time as superintendent—more specifically, on the reporting of any overtime hours as superintendent. Instead Cunningham, whom this Court found to be a totally credible witness, testified that during the conversation McInerney told him that he would not be paid for hours over 40 even though the job would sometimes require more than 40 hours. Based on that conversation as well as his conversations with former superintendents Zemla and Kratochvil, Cunningham understood that he would not be compensated for any hours over 40 that he worked as superintendent. Cunningham also testified that his understanding was that if he missed time from work, he would still be compensated for 40 hours each week. Accordingly, if he did miss a day or more during a work week, he still charged 40 hours to various projects and was paid for 40 hours each week.

13. Some of Cunningham's duties as superintendent included coordinating all manpower needs; hiring, firing and layoff of all electricians in Cook County; coordinating with all project managers and supervisors; increasing and monitoring productivity; reviewing productivity reports with project managers and supervisors; coordinating job start-ups and closings; and monitoring safety procedures (Stip. ¶ 15; P.Ex. 36). To carry out those duties Cunningham visited various job sites in Cook County every day. Because of the construction crew's normal work hours, those visits necessarily had to take place between the hours of 7 a.m. and 3:30 p.m. And to perform his job Cunningham also had to meet at Gibson's office in Oak Brook with project managers and with McInerney himself, usually before or after the construction crew hours.

14. During his first eight months as full time superintendent Cunningham did not report one hour of overtime. After Cunningham took over the superinten-

dent's duties McInerney never inquired of Cunningham how many hours the job required. In the same way, when Kratochvil had been superintendent McInerney never asked him how many hours it took to complete his duties each week. Yet McInerney had to know not only that both Kratochvil and Cunningham were spending overtime hours as superintendent but also that they were not reporting those hours, because McInerney reviewed the overtime hours for the entire company on a weekly basis—or at the very least reviewed the overtime hours (if any) reported by the superintendent. Instead McInerney simply did not care how many hours it took to complete the superintendent's duties, because he knew that Gibson was paying superintendents only on the basis of 40 hours a week.

15. During Cunningham's first eight months as full time superintendent, McInerney (as well as other office employees and project managers, including Kearney) saw Cunningham at the Oak Brook office on a regular basis both before and after the regular 7 a.m. to 3:30 p.m. hours of crew work. McInerney correctly assumed that if Cunningham was meeting with a project manager in the Oak Brook office, they were performing work for Gibson. In addition, Cunningham usually met with McInerney either before or after those regular hours of work in order to perform his required superintendent duties.

16. At all relevant times during his employment with Gibson, Cunningham maintained a personal calendar in which he recorded the hours that he worked each week and the number of hours for which he was paid (Stip. ¶ 24, P.Exs. 8, 9 and 10). Cunningham had maintained such a personal calendar ever since becoming an electrician. During the Sears Tower Project, once Kearney instructed him that he could not receive overtime pay, Cunningham started tracking hours that he worked but for which he was not paid. Cunningham used various methods to indicate what hours he worked, what hours he was paid

and sometimes the project on which he was working. At times he indicated both on a daily basis and also as a weekly total at the top of the calendar week the overtime hours he worked but for which he was not compensated (P.Ex. 8). Cunningham also indicated on his calendar if he was paid for overtime hours by either writing "for pay" after the hours notation or by not including such hours in the total at the end of the week (P.Exs. 8, 9 and 10). Significantly, Cunningham also indicated in his calendars the time that he did not work but for which he was nonetheless paid (P.Exs. 8, 9 and 10).

17. Between September 18, 1994 and November 11, 1996 there were work weeks during which Cunningham's calendar reflects that he worked more than 40 hours but reported only 40 hours to the payroll department and/or general foreman (Stip. ¶ 24). During the same time period there were some work weeks during which Cunningham's calendar reflects that he worked more than 40 hours and reported all hours worked to the payroll department and/or general foreman (Stip. ¶ 25).

18. During his first eight months as superintendent Cunningham had discretion to decide both (a) the projects to which he would charge his time as well as (b) the allocation of his time among those projects. For that purpose he did not need to have the project managers' permission to charge his time to their respective projects. Accordingly, if Cunningham missed a day of work he could still charge his time to a project and be paid for that day (P.Exs. 8, 9). In addition Cunningham was reimbursed for his expenses and his cellular phone bill (P.Exs. 11, 12), with his expense reports being approved by McInerney personally (P.Ex. 12). Cunningham never had a cellular phone bill expense turned down or questioned. Many of his phone bills reflect work calls both before and after the normal working hours (P.Ex. 11).

19. On May 10, 1995 McInerney changed Cunningham's duties as superintendent by reassigning the responsibility for productivity to project managers (Stip. ¶ 19, P.Ex. 13) and instructing Cunningham that he would be assigned to a particular job to supervise. Within a few weeks Cunningham was assigned to the Northwestern Temporary project, to run it as well as continue to perform his remaining duties as superintendent. That assignment also changed the manner in which Cunningham charged his time: At that point he started to charge all of his time, including time spent as superintendent, to the Northwestern Temporary project (P.Ex. 15). During that time he could no longer charge his superintendent time to any project he chose, or even to any project that he actually spent time on as superintendent, unless the project manager specifically requested him to do so (P.Ex. 13). McInerney's instructions in his May 10, 1995 memo to project managers (id.) specifically state "Brian will not get involved in your projects unless you ask him to do so and his time charged to those projects will be reflected accordingly."

20. As a result of that change in Cunningham's duties, he no longer had discretion to charge his time to a project when he missed work. Thus unless a project manager agreed to cover his time, Cunningham would not receive a full 40 hours of pay per week (P.Exs. 15, 21). After May 10, 1995 Cunningham continued to report directly to McInerney as superintendent and to project managers if he was running a job. In addition he had to continue to spend time in the Oak Brook office before and after regular work hours, both in order to deal with manpower changes (including hiring, firing and layoffs) and to meet with McInerney.

21. At the Northwestern Temporary project Cunningham reported to project manager Steve Schroeder ("Schroeder") Cunningham's duties included overseeing Gibson's various subcontractors, and once a Gibson crew was on site he ran the crew and the project. For that purpose his duties included going to the Oak Brook

office (necessarily before regular working hours), picking up a stake truck with the materials for the project, transporting them to the job site, overseeing the crew for the regular work day and then (necessarily after regular working hours) loading the equipment and materials back on the truck and transporting the truck back to the Oak Brook office.

22. Both for the reasons referred to in Finding 21 and sometimes for other reasons, Cunningham periodically worked more than 40 hours in a work week during the Northwestern Temporary project. Nonetheless he reported those hours only if the crew was also working overtime. That meant, for example, that he did not report the overtime hours that he worked as a superintendent or the overtime hours related to picking up and returning the truck and the materials to Gibson's offices.

23. At one point during the Northwestern Temporary project Cunningham asked Schroeder to cover some of his time while he vacationed in Florida, telling Schroeder that he was not reporting the time he was spending transporting the equipment and materials. Thereafter Cunningham and Schroeder discussed with McInerney whether Schroeder could cover Cunningham's limited vacation time in Florida. During that conversation Cunningham also repeated to McInerney that he was not reporting his time transporting the equipment and materials. Yet McInerney at no time told Cunningham that he should report that time, nor did he even ask Cunningham why he was not reporting his time. To return to the initial subject of this Finding, Schroeder did in fact cover Cunningham's time for a few days that Cunningham spent in Florida, and Cunningham reflected that in his calendar (P.Ex. 9).

24. After the Northwestern Temporary project, Cunningham was assigned to the CTA Green Line project, where Gibson was the general contractor. McInerney assigned Cunningham as the project's quality control auditor ("Auditor"). As the project progressed Cunningham also became the subcontractor coordinator ("Coordinator"). Cunningham's duties as Auditor included reviewing specifications for the projects and then ensuring that all subcontractors complied with them, ensuring that the subcontractors used correct materials that met the standards and making daily inspections of four buildings being constructed (P.Exs. 16, 17, 18, 19 and 20). As Coordinator, Cunningham made work schedules for all the subcontractors, ensured that the subcontractors had materials as needed and attended job meetings. In addition to those duties, Cunningham remained superintendent.

25. While at the Green Line project, Cunningham reported overtime hours there only if others on the project were also working overtime, and he did not report his overtime hours as superintendent (P.Exs. 15, 21). During the Green Line project Cunningham sometimes performed his superintendent duties during regular working hours, and sometimes he did so after regular working hours. Gelinas knew that at times Cunningham performed superintendent duties during the working day, but he also saw Cunningham on numerous occasions working in the Green Line office before and after regular working hours on the same day. Gelinas knew that Cunningham's duties as they related to the Green Line project alone were a full time 40 hour a week job and sometimes more. Cunningham's work performance on the Green Line project was above and beyond the normal type of work performed by a general foreman.

26. Cunningham remained at the Green Line project until its completion in May or June 1996, but he did not charge all of his time working there to that project. As stated in Finding 11, McInerney instructed Cunningham to report all of his time beginning in January 1996 to the MCA project, where Gibson had specifically negotiated with the customer to be reimbursed for "project management" and "superintendence," so that all hours Cunningham charged to the MCA project (in

addition to Gibson's markup on those hours) were paid directly by the customer (P.Ex. 35). Shortly after that project began Kearney instructed Cunningham that he could report all of his hours, including superintendent hours, because "the insurance company was picking up all our hours." Accordingly Cunningham charged all of his hours, including at least 40 hours each week he spent working on the Green Line project, to the MCA project for a period of approximately 10 weeks (P.Exs. 15, 16, 17 and 21). During the week ending February 2, 1996 Cunningham, as part of his Auditor's duties for the Green Line project, attended a training class in Cincinnati, Ohio (P.Ex. 22). For that week's training Cunningham's time was also charged to the MCA project pursuant to Kearney and Gelinas' instructions, while Cunningham's expenses of $575.65 were charged to the Green Line project (P.Exs. 21, 41 (Bates No. 1449), 42 (Bates No. 1807)). As also stated in Finding 11, Cunningham stopped charging all his time to the MCA project when Kearney informed him that he "could no longer bury my time."

27. In May 1996 McInerney assigned Cunningham to the Northwestern Hospital construction ("Northwestern Construction") project. McInerney told Cunningham over the phone that he thought Cunningham had done a good job at the CTA Green Line and he wanted Cunningham to perform many of the same duties on the Northwestern Construction project. Thereafter Cunningham received a memo from McInerney outlining his positions at the Northwestern Construction project, but telling Cunningham that his wage rate was being reduced from general foreman's pay to foreman's pay (P.Ex. 23). Cunningham promptly discussed the pay issue with McInerney and told McInerney that he was asking Cunningham to do a lot of work for only an ordinary foreman's pay. Thereafter McInerney called Cunningham to say that he would remain at general foreman's wages. At the time Cunningham was assigned to the Northwestern Construction project on a full time basis,

Cunningham was still acting as Gibson's superintendent for Cook County. Northwestern Construction's quality control program never completely materialized, so that Cunningham's full time position there was as a safety director, in which capacity he reported to Terry Beverly ("Beverly"). During that time Cunningham was able to perform most of his superintendent duties during the day, but if he had to perform superintendent duties before or after regular work hours he did not report that time.

28. In the fall of 1996 Cunningham encountered Beverly one night as he was leaving work. Cunningham commented to Beverly that the latter was sure logging long hours for no pay, to which Beverly responded that it was nothing that Cunningham had not done himself when he was running a big project. Cunningham agreed, although he said that he did not think Gibson would do well in a court of law for not paying for overtime work.

29. About two weeks after that conversation with Beverly, Cunningham was transferred to work on the CTA Cubic Fare project, which was a night shift job (P.Ex. 21). At that time Cunningham was still superintendent for Cook County and performed many of his superintendent duties during the day, when he was supposed to be off work. Some of those superintendent duties he reported and charged to the Cubic Fare project, while some he did not report at all.

30. During the first week of the Cubic Fare project, Kearney worked with the tools with Cunningham and the rest of the crew. Kearney told Cunningham that he had turned in his own overtime hours and that McInerney told him he was not going to pay Kearney for those hours. Kearney's pay records in fact indicate that he only received four hours of overtime on that project during the first week (P.Ex. 58). By contrast, Kearney did get paid for 455 hours of overtime and 49 hours of double time at the MCA T & M project (P.Ex. 58, Bates Nos. 16–17).

31. On November 11, 1996 McInerney issued a memo informing the office staff as well as Local 134 supervisors that Cunningham was no longer superintendent for Cook County (P.Ex. 31). McInerney told Cunningham about that demotion during a conversation in McInerney's office. Cunningham expressed his disappointment in the demotion and told McInerney that he had invested a lot of time in the position, though he did not specifically mention not being compensated for overtime hours. McInerney told Cunningham that he wanted to give him a bonus for the Green Line project but that he wanted Cunningham to sign a confidentiality statement indicating he would not discuss Gibson's hiring and firing practices. McInerney told Cunningham to see Tom Maimonis ("Maimonis") about the confidentiality statement and bonus check. Cunningham did just that, but when Maimonis presented the "confidentiality statement" Cunningham realized it was in fact a general release of his rights and decided not to sign it (P.Ex. 32). Consequently Cunningham did not receive any bonus for his work on the Green Line project.

32. Throughout his tenure as superintendent Cunningham created numerous documents and charts for McInerney relating to manpower issues (P.Exs. 25, 26, 27 and 28). Cunningham would meet with McInerney to discuss manpower issues and would also meet with project managers.

33. As indicated earlier, the manner in which Gibson instructed Cunningham and others how and where to charge their time was motivated by how it would most benefit Gibson economically (P.Exs. 37, 38). Essentially Gibson treated the position of superintendents just as it did the position of project managers: as salaried exempt employees. This is not to say that Gibson did not on occasion pay overtime to project managers and superintendents—rather that Gibson's adherence to the FLSA, in terms of its CBAs as well as its contract obligations, occurred only when it was profitable to do so.

34. From the time that he was an assistant project manager at Sears Tower until the time that he was demoted as superintendent, Cunningham performed an extraordinary amount of work for Gibson in a wide variety of positions (P.Exs. 6, 13, 16, 17, 19, 20, 22, 24, 25, 26, 27, 28, 29 and 30). It is beyond dispute that Gibson had to know that Cunningham could not perform all his duties, at each interval of his employment, in a 40 hour week. Yet at no time did McInerney communicate or attempt to communicate to Cunningham how he should report overtime hours worked as a superintendent. This Court fully credits Cunningham's testimony that McInerney specifically told him he would not receive overtime compensation as a superintendent. McInerney's testimony regarding an "overhead" job number that "everyone" knows about is simply not credible. Nor could McInerney point to any factor that would even lend support to an inference that someone—anyone—told Cunningham about such a number. Clearly McInerney himself did not. And Gelinas' testimony regarding the overhead job number is not credible, for he admitted on the stand that he did not know how he himself was aware of the overhead number, and that he and McInerney had discussed that very issue immediately before he took the stand.

35. There is overwhelming evidence that Gibson directed Cunningham as to where to work, where to charge his time, how much time to charge and when he could report overtime hours. In that respect Cunningham followed the instructions he was given by McInerney, Kearney, Gelinas and Schroeder. To the extent (if at all) that Cunningham had reported overtime hours and charged them to a specific project, that would have a direct impact on a cost of the project. McInerney himself receives bonuses on each project that makes a profit for the company, so that he has a personal motivation to save costs on every project the company performs. Labor is an electrical contractor's single biggest cost on a project.

36. Based on the credible evidence in the record, Cunningham was not compensated for these hours of overtime that he worked for Gibson:

(a) during the period from October 14 through December 31, 1994, 104 hours of overtime when his regular hourly rate of pay was $27.65 (P.Ex. 8, Stip.¶ 9);

(b) during the period from January 1 through May 31, 1995, 128.5 hours of overtime when his regular hourly rate of pay was $29.15 (P.Ex. 9, Stip.¶ 9);

(c) during the period from June 1, 1995 through May 31, 1996, 155 hours of overtime when his regular hourly rate of pay was $30.15 (P.Exs. 9, 10, Stip.¶ 9); and

(d) during the period from June 1 through November 11, 1996, 42 hours of overtime when his regular hourly rate of pay was $31.15 (P.Ex. 10, Stip.¶ 9).

37. Cunningham voluntarily left his employment with Gibson in October 1997 (Stip.¶ 26).

### Conclusions of Law

1. This Court has jurisdiction over this action under FLSA § 216(b) and 28 U.S.C. § 1331. Gibson is an employer within the meaning of FLSA § 203(d) and is subject to FLSA's provisions. Cunningham, while employed by Gibson, was covered by and entitled to the rights, protections and benefits provided by FLSA.

2. FLSA § 207(a)(1) mandates that "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." "Employ" is defined in FLSA § 203(g) as including "to suffer or permit to work." FLSA regulations (cited as "Reg. § ___," omitting the prefatory 29 C.F.R.) caution that "[w]ork not requested but suffered or permitted is work time" (Reg. § 785.11). Additionally Reg. § 785.13 states:

In all such cases it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so.

3. Gibson is liable under FLSA if it knew, either actually or constructively, that Cunningham was working overtime (*Bjornson v. Daido Metal U.S.A., Inc.,* 12 F.Supp.2d 837, 842 (N.D.Ill.1998) and cases cited there; *Reich v. Stewart,* 121 F.3d 400, 407 (8th Cir.1997)). As stated in *Reich v. Department of Conservation & Natural Resources,* 28 F.3d 1076, 1082 (11th Cir.1994) (internal quotation marks and citations omitted):

[A]n employer's knowledge is measured in accordance with his duty ... to inquire into the conditions prevailing in his business. An employer does not rid himself of that duty because the extent of the business may preclude his personal supervision, and compel reliance on subordinates.... The cases must be rare where prohibited work can be done ... and knowledge or the consequences of knowledge avoided. In reviewing the extent of an employer's awareness, a court need only inquire whether the *circumstances* ... were such that the employer either had knowledge of overtime hours being worked or else had the opportunity through reasonable diligence to acquire knowledge.

Knowledge of its supervisors is imputed to the employer (*id.* at 1083).

44. Any employer, "who is armed with knowledge that an employee is working overtime cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation" (*Newton v. City of Henderson,* 47 F.3d 746, 748 (5th Cir.1995) (internal brackets omitted), quoting *Forrester v. Roth's I.G.A. Foodliner, Inc.,* 646 F.2d 413, 414 (9th Cir.1981)). Relatedly, an employee is not estopped

from claiming additional overtime if the court finds "that the employer knew or had reason to believe that the [employee's] reported information was inaccurate" (*Newton,* 47 F.3d at 749, quoting *Brumbelow v. Quality Mills, Inc.,* 462 F.2d 1324, 1327 (5th Cir.1972)).

5. Where an employer claims a lack of knowledge but the evidence (as here) strongly supports an inference of deliberate ignorance, the proper conclusion (just as in the "ostrich" instruction that is often given to a jury in defining "knowingly" for criminal case purposes—see Seventh Circuit Federal Criminal Jury Instruction 4.06 (1998)) is that the employer knew about the overtime hours. As a matter of law, Gibson (through McInerney) actually knew that Cunningham was not reporting overtime hours that he worked as a full time superintendent from September 18, 1994 through May 10, 1995 because McInerney personally instructed him not to report those hours. McInerney's knowledge is also properly inferred through his actions in "consciously avoiding" knowledge of the actual uncompensated overtime hours that Cunningham worked during that period of time. For example, McInerney admitted that he saw Cunningham in the Oak Brook office after normal working hours, but he sought to avoid the obvious problem created by that acknowledgment by professing unpersuasively that he had no way of knowing what time Cunningham had started his day. Cunningham far more credibly testified that he generally started and ended each day in the Oak Brook office during his first eight months as superintendent, and that many times during that period he was there specifically to meet with McInerney as well as project managers. Yet Cunningham did not report one hour of overtime in those eight months. Additionally, because McInerney knew that the two prior superintendents were paid on a salary basis regardless of the number of hours they worked, this Court has drawn the entirely reasonable inference that Cunningham was being compensated on the same basis (and was therefore not being compensated for overtime hours). Accordingly McInerney had actual knowledge that Cunningham was reporting 40 hours of work each week regardless of the number of hours he actually worked. As in *Reich v. Department of Conservation,* the fact that McInerney professes not to have had personal knowledge of Cunningham's actual hours did not relieve Gibson of its obligation to inquire and thereby to avoid liability.

6. As of May 10, 1995, when McInerney changed Cunningham's duties as superintendent and at the same time assigned him to work full time in another capacity, McInerney (and hence Gibson) had to continue to know that Cunningham's duties required more than 40 hours of work per week. Because the whole equals the sum of its parts, when Cunningham's continued part-time hours as superintendent were added to his new full-time assignment to the Northwestern Temporary project, Gibson had to know that Cunningham required overtime hours in order to complete his duties. In addition, when after he had been assigned to the Northwestern Temporary project Cunningham asked to have some vacation time covered by the project, he directly informed McInerney as well as Schroeder that he was not reporting all his hours on the project (see Finding 23).

7. After the Northwestern Temporary assignment, McInerney assigned Cunningham to the Green Line project on a full time basis to perform numerous functions in addition to his duties as superintendent. Gelinas was aware both (a) that Cunningham's duties on the Green Line project involved a 40 hour a week job, and sometimes more, and (b) that Cunningham also maintained his duties as superintendent at the same time. Yet Gelinas, like McInerney, took no steps to ascertain whether Cunningham was reporting all his overtime hours.

8. Kearney also had knowledge that Cunningham was not reporting his overtime hours as superintendent. In that re-

spect, there was no evidence to counter Cunningham's testimony that Kearney instructed him to report *all* of his hours while billing his time to the MCA project. That instruction would make no sense—it would have been unnecessary—unless Kearney knew that Cunningham did not normally report his overtime hours as superintendent.

9. In summary, for the reasons set out in Conclusions 5 through 8 (which are in turn squarely based on the Findings), it must be concluded that Gibson had both actual and constructive knowledge that Cunningham had a large number of uncompensated overtime hours.

 10. To prove that an employer has violated FLSA, an employee must also "show the amount and extent of overtime work as a matter of just and reasonable inference" (*Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir.1986), citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946)). Cunningham has met that burden under the law with the evidence provided through his personal calendars. Although a few inconsistencies in its entries were illustrated at trial, the calendars as a whole certainly provide a "just and reasonable inference" as to the overtime hours that Cunningham worked.

 11. If an employer willfully violates the provisions of FLSA, the statute of limitations on an employee's cause of action is extended from two to three years (29 U.S.C. § 255(a)). "Willfulness" requires a showing "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute" (*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988); *Bankston v. State of Illinois*, 60 F.3d 1249, 1253 (7th Cir.1995)). In the determination of whether an employer's actions were willful, the term should be viewed as "synonymous with such words as 'voluntary,' 'deliberate,' and 'intentional'" (*McLaughlin*, 486 U.S. at 133, 108 S.Ct. 1677). And when as here a company president has actual knowledge

of FLSA's requirements and fails to comply, the company has acted willfully (*Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 967 (6th Cir.1991)).

 12. McInerney clearly had knowledge of FLSA and its requirements, something directly confirmed not only by the matters already referred to in the Findings and Conclusions but also by his response to a question from this Court about paying Cunningham for overtime hours that he spent at an apprenticeship meeting—McInerney answered that he would have to pay Cunningham for overtime hours if Cunningham reported them. And as set out in Finding 23, when Cunningham told McInerney that he was not reporting all his hours at the Northwestern Temporary project, McInerney neither expressed surprise nor instructed Cunningham that he should of course report all his hours—thus deliberately avoiding Gibson's FLSA obligations. McInerney's instructions to Cunningham that he would not be compensated for more than 40 hours prove directly that Gibson's actions in failing so to compensate Cunningham were intentional, voluntary and deliberate (being motivated by Gibson's desire to increase its profits). Taken as a whole, the circumstances in this case plainly demonstrate that Gibson maintained an intentional practice of failing to compensate Cunningham in accordance with FLSA. Thus Gibson's actions were willful, and the three year statute of limitations is applicable.

 13. Liquidated damages in an amount equal to the unpaid overtime wages are to be awarded unless the employer demonstrates a good faith or reasonable belief that its conduct is lawful (FLSA § 216(b) and 29 U.S.C. § 260). *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1223 (7th Cir.1995), citing *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir.1986), teaches that the award of double damages is the norm rather than the exception, with the employer bearing a substantial burden in showing that it acted reasonably and in

good faith (*Bankston,* 60 F.3d at 1254). Moreover, Gibson really waived this issue at trial, presenting no evidence to establish that it acted reasonably. This Court concludes as a matter of law that Gibson's actions lacked good faith, rendering an award of liquidated damages appropriate.

14. FLSA § 216(b) directs the award of reasonable attorney's fees and costs to victorious plaintiffs who bring civil actions to recover for overtime (*Bankston,* 60 F.3d at 1255). Hence Cunningham will be awarded an amount to be proved as reasonable attorney's fees and costs for recovering his overtime compensation.

15. Based on Finding 36, the overtime compensation owed to Cunningham for the period from October 14 through December 31, 1994 is 104 times 1 ½ times $27.65, or $4,313.40; for the period from January 1 through May 31, 1995 is 128.5 times 1 ½ times $29.15, or $5,618.66; for the period from June 1, 1995 through May 31, 1996 is 155 times 1 ½ times $30.15, or $7,009.88; and for the period from June 1 through November 11, 1996 is 42 times 1 ½ times $31.15, or $1,962.45. Those amounts total $18,904.39.

\* \* \* \* \* \*

It is hereby ordered that judgment be entered in favor of Cunningham and against Gibson in the amount of $18,904.39 as overtime compensation and in the amount of $18,904.39 as liquidated damages, or an aggregate of $37,808.78. In accordance with FLSA § 216(b) Cunningham will also be awarded reasonable attorney's fees and costs, to be determined under the procedures set out in this District Court's General Rules 46 and 47. That future award does not affect the finality of the judgment ordered here (*Budinich v. Becton Dickinson & Co.,* 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988)).